1  Michael R. Lozeau (State Bar No. 142893)
   Richard T. Drury (State Bar No. 163559)
2  Douglas J. Chermak (State Bar No. 233382)
3  LOZEAU DRURY LLP
   410 12th Street, Suite 250
4  Oakland, CA 94607
5  Tel: (510) 836-4200
   Fax: (510) 836-4205 (fax)
6  E-mail: michael@lozeaudrury.com
7          richard@lozeaudrury.com
           doug@lozeaudrury.com
8
9  Attorneys for Plaintiff
   CALIFORNIA COMMUNITIES
10 AGAINST TOXICS

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13 | CALIFORNIA COMMUNITIES | Case No. 2:14-cv-7659
14 | AGAINST TOXICS, an
   | unincorporated non-profit association,
15 |
16 |              Plaintiff,              | **COMPLAINT FOR**
   |                                       | **DECLARATORY AND**
17 |        vs.                            | **INJUNCTIVE RELIEF AND CIVIL**
   |                                       | **PENALTIES**
18 |
19 | CARLTON FORGE WORKS, a
   | corporation,                         | (Federal Water Pollution Control Act,
20 |                                       | 33 U.S.C. §§ 1251 to 1387)
21 |              Defendant.
22 |

23     CALIFORNIA COMMUNITIES AGAINST TOXICS ("CCAT"), a California
24
25 non-profit association, by and through its counsel, hereby alleges:

26 **I.    JURISDICTION AND VENUE**

27     1.    This is a civil suit brought under the citizen suit enforcement provisions
28

COMPLAINT
                                    1

of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.     On July 15, 2014, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CCAT's notice letter is attached as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

COMPLAINT

2

This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   <u>INTRODUCTION</u>

5.     This complaint seeks relief for Defendant's discharges of polluted storm water and non-storm water pollutants from Defendant's industrial facility located at 7743 Adams Street in Paramount, California ("Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ (hereinafter the "Permit" or "General Permit").  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

## III.   <u>PARTIES</u>

6.     Plaintiff CALIFORNIA COMMUNITIES AGAINST TOXICS ("CCAT") is an unincorporated non-profit association under the laws of the State of California with its main office in Rosamond, California.  CCAT has members who

COMPLAINT

live, recreate and work in and around waters in the vicinity of Defendant's Facility. CCAT is dedicated to the preservation, protection, and defense of the environment, particularly with respect to areas and waters near urban industrial communities. To further these goals, CCAT actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members. CCAT brings this action on behalf of its members. CCAT's interest in reducing Defendant's discharges of pollutants into Los Angeles County's municipal storm drain system and the Los Angeles River and its tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CCAT.

7.     Members of CCAT reside in and around the Los Angeles River and enjoy using the Los Angeles River for recreation and other activities. One or more members of CCAT use and enjoy the waters into which Defendant has caused, are causing, and will continue to cause, pollutants to be discharged. One or more members of CCAT use those areas to recreate and view wildlife, among other things. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of one or more members of CCAT have been, are being, and will continue to be adversely affected by

COMPLAINT

Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

8.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

9.     Defendant CARLTON FORGE WORKS ("Carlton") is a corporation that operates an industrial facility in Paramount, California.

## IV.   STATUTORY BACKGROUND

10.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

11.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

12.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator

of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

13.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  On April 1, 2014, the State Board reissued the General Permit.  State Board Order 2014-0057-DWQ.  The reissued version of the General Permit does not go into effect until July 1, 2015.  Until that time, the April 17, 1997 General Permit remains in full force and effect.s

14.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

15.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8).  Discharge Prohibition A(2) of the General Permit prohibits storm water

COMPLAINT

discharges and authorized non-storm water discharges that cause or threaten to cause

pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the

General Permit prohibits storm water discharges to any surface or ground water that

adversely impact human health or the environment.  Receiving Water Limitation C(2)

of the General Permit prohibits storm water discharges that cause or contribute to an

exceedance of any applicable water quality standards contained in Statewide Water

Quality Control Plan or the applicable Regional Board's Basin Plan.

16.     In addition to absolute prohibitions, the General Permit contains a variety

of substantive and procedural requirements that dischargers must meet.  Facilities

discharging, or having the potential to discharge, storm water associated with

industrial activity that have not obtained an individual NPDES permit must apply for

coverage under the State's General Permit by filing a Notice of Intent to Comply

("NOI").  The General Permit requires existing dischargers to have filed their NOIs

before March 30, 1992.

17.     Dischargers must develop and implement a Storm Water Pollution

Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities

and measures that comply with the BAT and BCT standards.  The General Permit

requires that an initial SWPPP have been developed and implemented before October

1, 1992.  The SWPPP must, among other requirements, identify and evaluate sources

of pollutants associated with industrial activities that may affect the quality of storm

COMPLAINT

1   and non-storm water discharges from the facility and identify and implement site-

2   specific best management practices ("BMPs") to reduce or prevent pollutants

3
4   associated with industrial activities in storm water and authorized non-storm water

5   discharges (Section A(2)).  The SWPPP's BMPs must implement BAT and BCT

6   (Section B(3)).  The SWPPP must include: a description of individuals and their

7
8   responsibilities for developing and implementing the SWPPP (Section A(3)); a site

9   map showing the facility boundaries, storm water drainage areas with flow pattern and

10  nearby water bodies, the location of the storm water collection, conveyance and

11
12  discharge system, structural control measures, impervious areas, areas of actual and

13  potential pollutant contact, and areas of industrial activity (Section A(4)); a list of

14  significant materials handled and stored at the site (Section A(5)); a description of

15
16  potential pollutant sources including industrial processes, material handling and

17  storage areas, dust and particulate generating activities, and a description of

18
19  significant spills and leaks, a list of all non-storm water discharges and their sources,

20  and a description of locations where soil erosion may occur (Section A(6)).  The

21
22  SWPPP must include an assessment of potential pollutant sources at the Facility and a

23  description of the BMPs to be implemented at the Facility that will reduce or prevent

24  pollutants in storm water discharges and authorized non-storm water discharges,

25
26  including structural BMPs where non-structural BMPs are not effective (Section A(7),

27  (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised

28

COMPLAINT

8

1   where necessary (Sections A(9), (10)).

2       18.     Section C(11)(d) of the General Permit's Standard Provisions requires

3   dischargers to report any noncompliance to the Regional Board. *See also* Section

4   E(6). Section A(9) of the General Permit requires an annual evaluation of storm water

5   controls including the preparation of an evaluation report and implementation of any

6

7   additional measures in the SWPPP to respond to the monitoring results and other

8   inspection activities.

9

10      19.     The General Permit requires dischargers commencing industrial activities

11  before October 1, 1992 to develop and implement an adequate written monitoring and

12

13  reporting program no later than October 1, 1992. Existing facilities covered under the

14  General Permit must implement all necessary revisions to their monitoring programs

15

16  no later than August 1, 1997.

17      20.     As part of their monitoring program, dischargers must identify all storm

18

19  water discharge locations that produce a significant storm water discharge, evaluate

20  the effectiveness of BMPs in reducing pollutant loading, and evaluate whether

21

22  pollution control measures set out in the SWPPP are adequate and properly

23  implemented. Dischargers must conduct visual observations of these discharge

24  locations for at least one storm per month during the wet season (October through

25

26  May) and record their findings in their Annual Report. Dischargers must also collect

27  and analyze storm water samples from at least two storms per year. Section B(5)(a) of

28

COMPLAINT

the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters, such as pH, total suspended solids, electrical conductance, and total organic content or oil & grease, certain industry-specific parameters.  Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Section B(5)(c)(iii) requires discharges to sample for parameters dependent on a facility's standard industrial classification ("SIC") code.  Section B(7)(a) indicates that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."  Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample…facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm water discharges from the storm event."

21.    The General Permit requires that facility operators "investigate the facility to identify all non-storm water discharges and their sources.  As part of this investigation, all drains (inlets and outlets) shall be evaluated to identify whether they connect to the storm drain system.  All non-storm water discharges shall be described.

This shall include the source, quantity, frequency, and characteristics of the non-storm water discharges and associated drainage area." Section A(6)(a)(v).  The General Permit authorizes certain non-storm water discharges providing that the non-storm water discharges are in compliance with Regional Board requirements; that the non-storm water discharges are in compliance with local agency ordinances and/or requirements; that best management practices ("BMPs") are included in the Storm Water Pollution Prevention Plan to (1) prevent or reduce the contact of non-storm water discharges with significant materials or equipment and (2) minimize, to the extent practicable, the flow or volume of non-storm water discharges; that the non-storm water discharges do not contain significant quantities of pollutants; and that the monitoring program includes quarterly visual observations of each non-storm water discharge and its sources to ensure that BMPs are being implemented and are effective (Special Conditions D).  Section B(3) of the General Permit requires dischargers to conduct visual observations of all drainage areas for the presence of non-storm water discharges, to observe the non-storm water discharges, and maintain records of such observations.

22.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires

COMPLAINT

the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit. *See also* Sections C(9), C(10) and B(14).

23.    The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any dilution credits to be applied by dischargers.

24.    The Regional Board has established water quality standards for the Los Angeles River Watershed in the "Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties", generally referred to as the Basin Plan.

25.    The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

26.    The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

27.    The Basin Plan provides that "[w]aters shall not contain suspended or

settleable material in concentrations that cause nuisance or adversely affect beneficial uses."

28.     The Basin Plan provides that "[t]he pH of bays or estuaries [or inland surface waters] shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges."

29.     The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."

30.     The Basin Plan provides that "[w]ater shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

31.     The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.  Water designated for use as Domestic or Municipal Supply (MUN) shall not contain concentrations of chemical constituents in excess of the limits specified in the following provisions of Title 22 of the California Code of Regulations which are incorporated by reference into this plan: Table 64431-A of Section 64431 (Inorganic Chemicals)…"  The Basin Plan provides a Maximum Contaminant Level ("MCL") for aluminum of 1 mg/L.

32.     The EPA 303(d) List of Water Quality Limited Segments lists Reach 1 of

the Los Angeles River, the next segment downstream from where the Facility's storm water discharges – as impaired for zinc.  *See* http://www.waterboards.ca.gov/ centralvalley/water_issues/tmdl/impaired_waters_list/2008_2010_usepa_303dlist/200 82010_usepa_aprvd_303dlist.pdf.  As a result, the Basin Plan contains additional water quality standards for the Los Angeles River in an amendment setting forth Total Maximum Daily Loads ("TMDLs") for the Los Angeles River.  *See* http://63.199.216.6/larwqcb_new/bpa/docs/R10-003/R10-003_RB_BPA.pdf.  For General Industrial Storm Water permittees, the Basin Plan sets forth interim wet-weather concentration-based waste load allocations ("WLAs") that have been enforceable conditions for discharges since January 11, 2011.  There is a WLA for zinc of 0.117 mg/L.

33.    The EPA has adopted a freshwater numeric water quality standard for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC").  65 Fed.Reg. 31712 (May 18, 2000) (California Toxics Rule).

34.    EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  EPA has established Parameter Benchmark Values for the following parameters, among others: pH – 6.0 - 9.0 units; total suspended solids ("TSS") – 100 mg/L, oil and grease ("O&G") – 15 mg/L, chemical oxygen demand ("COD") – 120 mg/L, nitrate plus nitrite as nitrogen ("N+N") – 0.68 mg/L, zinc –

0.13 mg/L, cadmium – 0.0023 mg/L, aluminum – 0.75 mg/L, and iron – 1.0 mg/L.

35.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.     **STATEMENT OF FACTS**

36.     Defendant operates an industrial facility located at 7743 Adams Street in Paramount, California.  On information and belief, CCAT alleges that the Facility is engaged in the manufacturing of seamless rolled rings and open and closed die forgings for the aerospace, gas turbine, industrial, commercial, and nuclear industries. The Facility falls within SIC Codes 3462 and 3463.  The majority of the Facility is paved and used for receiving, storing, sorting, and transporting finished goods and raw materials.  On information and belief, Plaintiff alleges that there are at least six large buildings located on the property.  Plaintiff is informed and believes, and thereupon alleges that manufacturing activities are conducted both inside these buildings and in the outside areas of the Facility.

37.     Defendant channels and collects storm water falling on the Facility

COMPLAINT

through a series of storm water drains that leads to at least fifteen storm water outfalls. The Facility's outfall discharges to the City of Paramount storm sewer system which flows to the Los Angeles County Flood Control District storm system which discharges into the Los Angeles River.

38.     On information and belief, Plaintiff alleges that the industrial activities at the Facility include the manufacturing of seamless rolled rings and open and closed die forgings.  They also include the storage, fueling, and maintenance of forklifts and other machinery used to transfer and manufacture these products.  Raw materials including carbon and alloy steels, aluminum, titanium, nickel, cobalt, and other exotic high-temperature metals are used in these manufacturing processes, and raw materials, finished products, and waste materials are stored outdoors.

39.     On information and belief, Plaintiff alleges that all storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

40.     Significant activities at the site take place outside and are exposed to rainfall.  These activities include the storage, handling, and transfer of finished goods and raw materials.  Loading and delivery of materials and finished products occurs outside.  Trucks enter and exit the Facility directly from and to a public road.  Trucks, forklifts, and other machinery are the primary means of moving materials around the Facility.  These areas are exposed to storm water and storm flows due to the lack of

COMPLAINT

overhead coverage, berms, and other storm water controls.

41.     Industrial machinery, heavy equipment and vehicles, including trucks and forklifts are operated at the Facility in areas exposed to storm water flows. Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment leak contaminants such as oil, grease, diesel fuel, coolant, and hydraulic fluids that are exposed to storm water flows, and that such machinery and equipment track sediment and other contaminants throughout the Facility.  On information and belief, Plaintiff alleges that trucks leaving the Facility track substantial amounts of material onto adjoining public roads.  On information and belief, Plaintiff alleges that during rain events, material that has been tracked from the Facility onto public roads during dry weather is transported via storm water to storm drain channels.

42.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease, metals, and other pollutants as it flows toward the storm water drains. Storm water and any pollutants contained in that storm water entering the drains flows directly to the Facility's outfalls which discharge to the City of Paramount storm sewer system which flows to the Los Angeles County Flood Control District storm system which discharges into the Los Angeles River.

43.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of

pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with these and other exposed sources of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.  The Facility lacks controls to prevent the tracking and flow of pollutants onto adjacent public roads.

44.     Since at least October 13, 2009, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's annual reports submitted to the Regional Board. Defendant certified each of those annual reports pursuant to Sections A and C of the General Permit.

45.     Since at least October 30, 2010, the Facility has detected TSS in storm water discharged from the Facility.  Since at least January 30, 2011, the Facility has detected O&G in storm water discharged from the Facility.  Since at least March 17, 2012, the Facility has detected zinc and aluminum in storm water discharged from the Facility.  Levels of these pollutants detected in the Facility's storm water have been in excess of EPA's numeric parameter benchmark values.  Levels of these pollutants detected in the Facility's storm water have been in excess of the parameters for water

quality standards established in the Basin Plan.

46.     The following discharges on the following dates contained concentrations of pollutants in excess of numeric water quality standards established in the Basin Plan:

| Date | Parameter | Observed Concentration | Basin Plan Water Quality Standard / EPA California Toxics Rule | Outfall (as identified by the Facility) |
|------|-----------|------------------------|----------------------------------------------------------------|------------------------------------------|
| 3/6/2013 | Aluminum | 3.78 mg/L | 1.0 mg/L (MCL) | Jefferson Gate Main |
| 3/6/2013 | Aluminum | 5 mg/L | 1.0 mg/L (MCL) | Parking Lots |
| 3/6/2013 | Aluminum | 1.95 mg/L | 1.0 mg/L (MCL) | Main Gate |
| 3/6/2013 | Aluminum | 14 mg/L | 1.0 mg/L (MCL) | Jefferson |
| 12/13/2012 | Aluminum | 4.64 mg/L | 1.0 mg/L (MCL) | Jefferson Shipping |
| 12/13/2012 | Aluminum | 1.8 mg/L | 1.0 mg/L (MCL) | Jefferson Plant |
| 12/13/2012 | Aluminum | 1.61 mg/L | 1.0 mg/L (MCL) | Main Gate |
| 12/13/2012 | Aluminum | 1.26 mg/L | 1.0 mg/L (MCL) | Vermont |
| 4/13/2012 | Aluminum | 2.69 mg/L | 1.0 mg/L (MCL) | Jefferson Shipping Water |
| 4/13/2012 | Aluminum | 2.48 mg/L | 1.0 mg/L (MCL) | Jefferson Plant Water |
| 4/13/2012 | Aluminum | 1.23 mg/L | 1.0 mg/L (MCL) | Stormwater Main Gate |
| 4/13/2012 | Aluminum | 3.71 mg/L | 1.0 mg/L (MCL) | Vermont Ave Water |
| 3/6/2013 | Zinc | 0.447 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Jefferson Gate Main |
| 3/6/2013 | Zinc | 2.68 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Parking Lots |
| 3/6/2013 | Zinc | 3.06 mg/L | 0.117 mg/L (WLA) / | Main Gate |

| | | | 0.120 mg/L (CMC) | |
|---|---|---|---|---|
| 3/6/2013 | Zinc | 1.76 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Jefferson |
| 12/13/2012 | Zinc | 1.27 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Jefferson Shipping |
| 12/13/2012 | Zinc | 0.269 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Jefferson Plant |
| 12/13/2012 | Zinc | 5.44 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Main Gate |
| 12/13/2012 | Zinc | 4.13 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Vermont |
| 4/13/2012 | Zinc | 0.641 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Jefferson Shipping Water |
| 4/13/2012 | Zinc | 0.346 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Jefferson Plant Water |
| 4/13/2012 | Zinc | 1.72 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Stormwater Main Gate |
| 4/13/2012 | Zinc | 1.33 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Vermont Ave Water |
| 3/17/2012 | Zinc | 0.148 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Jefferson |
| 3/17/2012 | Zinc | 0.157 mg/L | 0.117 mg/L (WLA) / 0.120 mg/L (CMC) | Park Areas |

47.    The level of TSS in storm water detected by the Facility has exceeded the benchmark value for TSS of 100 mg/L established by EPA.  For example, on January 30, 2011, the level of TSS measured by Defendant at one of its outfalls was 409 mg/L.

COMPLAINT

That level of TSS is over 4 times the benchmark value for TSS.  Carlton also has

measured levels of TSS in storm water discharged from the Facility in excess of 100

mg/L on the following dates: March 6, 2013; December 13, 2012; April 13, 2012;

March 17, 2012; and October 30, 2010.

48.     The level of O&G in storm water detected by the Facility has exceeded

the benchmark value for O&G of 15 mg/L established by EPA.  For example, on

March 6, 2013, the level of O&G measured by Defendant at one of the Facility's

outfalls was 24.9 mg/L.  That level of O&G is over 1.6 times the benchmark value for

O&G.  The Facility also has measured levels of O&G in storm water discharged from

the Facility in excess of 15 mg/L on the following dates: December 13, 2012; April

13, 2012; and January 30, 2011.

49.     The level of COD in storm water detected by the Facility has exceeded

the benchmark value for COD of 120 mg/L established by EPA.  For example, on

March 6, 2013, the level of COD measured by Defendant at one of the Facility's

outfalls was 306 mg/L.  That level of COD is over 2.5 times the benchmark value for

COD.  The Facility also has measured levels of COD in storm water discharged from

the Facility in excess of 120 mg/L in every other storm water sample it has taken

when it measured for COD including on December 13, 2012.

50.     The levels of aluminum in storm water detected by the Facility have

exceeded the Maximum Contaminant Level for aluminum of 1 mg/L established by

the Basin Plan.  For example, on December 13, 2012, the level of aluminum measured from one of Facility's storm water outfalls was 4.64 mg/L.  That level of aluminum is almost 5 times the Maximum Contaminant Level for aluminum.  The Facility also has measured levels of aluminum in storm water discharged from the Facility in excess of 1.0 mg/L in nearly every other storm water sample it has taken for the past five years when it measured for aluminum, including March 6, 2013; and April 13, 2012.

51.     The level of aluminum in storm water detected by the Facility has exceeded the benchmark value for aluminum of 0.75 mg/L established by EPA.  For example, on December 13, 2012, the level of aluminum measured by Defendant at one of the Facility's outfalls was 4.64 mg/L.  That level of aluminum is over 6 times the benchmark value for aluminum.  The Facility also has measured levels of aluminum in storm water discharged from the Facility in excess of 0.75 mg/L in nearly every other storm water sample it has taken for the past five years when it measured for aluminum, including March 6, 2013; April 13, 2012; and March 17, 2012.

52.     The levels of zinc in storm water detected by the Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.12 mg/L for zinc (CMC) and the WLA established by the Basin Plan of 0.117 mg/L for zinc. For example, on December 13, 2012, the level of zinc measured from one of the Facility's storm water outfalls was 5.44 mg/L.  That level of zinc is over 45 times the

COMPLAINT

CMC for zinc, and over 46 times the WLA for zinc.  The Facility also has measured levels of zinc in storm water discharged from the Facility in excess of 0.12 mg/L in every other storm water sample it has taken for the past five years when it measured for zinc, including March 6, 2013; April 13, 2012; and March 17, 2012.

53.     The level of zinc in storm water detected by the Facility has exceeded the benchmark value for zinc of 0.13 mg/L established by EPA.  For example, on December 13, 2012, the level of zinc measured by Defendant at one of the Facility's outfalls was 5.44 mg/L.  That level of zinc is almost 42 times the benchmark value for zinc.  The Facility also has measured levels of zinc in storm water discharged from the Facility in excess of 0.13 mg/L in every other storm water sample it has taken for the past five years when it measured for zinc, including March 6, 2013; April 13, 2012; and March 17, 2012.

54.     On information and belief, Plaintiff alleges that Defendant failed to analyze its storm water discharges for iron and N+N in each and every storm water sample taken at the facility during the 2013-2014, 2012-2013, 2011-2012, and 2010-2011 wet seasons.  Defendant is required to monitor for iron and N+N pursuant to General Permit Section B(5)(c)(iii) pursuant to its SIC Code.  Defendant also lists iron and N+N as required parameters in Section 5.2.2 of its SWPPP.

55.     On information and belief, Plaintiff alleges that Defendant failed to analyze its storm water samples for COD during the 2011-2012 wet season.

COMPLAINT

23

Defendant is required to monitor for pollutants likely to be found in its storm water discharges pursuant to General Permit Section B(5)(c)(ii).

56.    On information and belief, Plaintiff alleges that Defendant failed to analyze its storm water discharges for COD, zinc, and aluminum during the 2010-2011 wet season.

57.    On information and belief, Plaintiff alleges that Defendant failed to sample and analyze storm water discharges from at least two of the Facility's representative outfalls during the 2011-2012 wet season, on March 17, 2012.

58.    On information and belief, Plaintiff alleges that Defendant failed to sample and analyze any storm water discharges during the 2009-2010 wet season.

59.    On information and belief, Plaintiff alleges that Defendant failed to conduct monthly visual observations from its discharge points 5, 6, 7, 8, and 9, during the 2012-2013, 2011-2012, and 2010-2011 wet seasons.

60.    On information and belief, Plaintiff alleges that Defendant failed to conduct monthly visual observations from all of its discharge points during at least the following months in the indicated years, months in which CCAT alleges that qualified rain events occurred at the Facility: 2013 – February; 2012 – February, November, December; 2011 – February, October, November, December; 2010 – February, April, November; 2009 – October, December.

61.    On information and belief, Plaintiff alleges that Defendant failed to

COMPLAINT

24

properly record its visual observations of storm water discharges on March 6, 2013;

December 13, 2012; April 13, 2012; and January 30, 2011.  On these dates, Carlton

conducted observations of storm water discharges and did not report observing *any*

pollutants.  However, Carlton's storm water sampling results for these dates indicate

levels of O&G well above the benchmark value of 15 mg/L – levels at which CCAT

alleges that Carlton should be observing the presence of oil sheens in its storm water

discharges.  These discharges contained O&G concentrations that ranged from 16.3

mg/L to 25.6 mg/L.  CCAT alleges that it would be impossible for waters with O&G

concentrations in this range to be free of visible sheens.

62.     On information and belief, CCAT alleges that Carlton combined storm

water samples in violation of the General Permit.  Section B(7)(d) of the General

Permit provides that "Facility operators that determine that the industrial activities and

BMPs within two or more drainage areas are substantially identical may either (i)

collect samples from a reduced number of substantially identical drainage areas, or (ii)

collect samples from each substantially identical drainage area and analyze a

combined sample from each substantially identical drainage area. Facility operators

must document such a determination in the annual report."  Carlton has not made any

documentation that its combined storm water samples from Points 1, 2, 3, and 4

involve areas with substantially identical industrial activities and BMPs.  On

information and belief, CCAT alleges that these areas involve different industrial

activities and different BMPs.  Thus, CCAT alleges Carlton is in violation of the

General Permit each time it has taken a combined storm water sample.

63.    On information and belief, Plaintiff alleges that since at least August 3,

2009, Defendant has failed to implement BAT and BCT at the Facility for their

discharges of TSS,O&G, CO, zinc, aluminum, iron, N+N, and other un-monitored

pollutants.  Section B(3) of the General Permit requires that Defendant implement

BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by

no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed

to implement BAT and BCT.

64.    On information and belief, Plaintiff alleges that since at least August 3,

2009, Defendant has failed to implement an adequate Storm Water Pollution

Prevention Plan for the Facility.  Plaintiff is informed and believes, and thereupon

alleges, that the SWPPP prepared for the Facility does not set forth site-specific best

management practices for the Facility that are consistent with BAT or BCT for the

Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP

prepared for the Facility does not include an adequate assessment of potential

pollutant sources, structural pollutant control measures employed by the Defendant, a

list of actual and potential areas of pollutant contact, or an adequate description of

best management practices to be implemented at the Facility to reduce pollutant

discharges.  According to information available to CCAT, Defendant's SWPPP has

COMPLAINT

not been evaluated to ensure its effectiveness and revised where necessary to further

reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges,

that the SWPPP does not include each of the mandatory elements required by Section

A of the General Permit.

65.     Information available to CCAT indicates that as a result of these

practices, storm water containing excessive pollutants is being discharged during rain

events to the City of Paramount storm sewer system which flows to the Los Angeles

County Flood Control District storm system which discharges into the Los Angeles

River.

66.     Plaintiff is informed and believes, and thereupon alleges, that Defendant

has failed and continue to fail to alter the Facility's SWPPP and site-specific BMPs

consistent with Section A(9) of the General Permit.

67.     Plaintiff is informed and believes that Defendant failed to submit to the

Regional Board a true and complete annual report certifying compliance with the

General Permit since at least June 18, 2010.  Pursuant to Sections A(9)(d), B(14), and

C(9), (10) of the General Permit, Defendant must submit an annual report, that is

signed and certified by the appropriate corporate officer, outlining the Facility's storm

water controls and certifying compliance with the General Permit.  Plaintiff is

informed and believes, and thereupon alleges, that Defendant has signed incomplete

annual reports that purported to comply with the General Permit when there was

COMPLAINT

27

significant noncompliance at the Facility.

68.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

69.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

70.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of TSS, COD, O&G, aluminum, zinc, iron, N+N, and other un-monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

71.     Each day since August 3, 2009, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct

violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

72.     Defendant has been in violation of the BAT/BCT requirements every day since August 3, 2009.  Defendant continue to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

**SECOND CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

73.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

74.     Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

75.     Plaintiff is informed and believes, and thereupon alleges, that since at least August 3, 2009, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards in violation of the Discharge

COMPLAINT

Prohibition A(2) of the General Permit.

76.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with aluminum, zinc, and other un-monitored pollutants at levels above applicable water quality standards.  The storm water then flows untreated to the City of Paramount storm sewer system which flows to the Los Angeles County Flood Control District storm system which discharges into the Los Angeles River.

77.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

78.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

79.     Every day since at least August 3, 2009, that Defendant has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### THIRD CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update**

COMPLAINT

**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

80.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

81.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

82.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's outdoor storage of various materials without appropriate best management practices; the continued exposure of significant quantities of various materials to storm water flows; the continued exposure and tracking of waste resulting from the operation of vehicles at the site, including trucks and forklifts; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and water quality standards.

83.     Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

84.     Each day since August 3, 2009, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct

COMPLAINT

violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

85.     Defendant has been in violation of the SWPPP requirements every day since August 3, 2009.  Defendant continue to be in violation of the SWPPP requirements each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

### FOURTH CAUSE OF ACTION
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

86.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

87.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

88.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to analyze its storm water discharges for iron and N+N in each and every storm water sample taken at the facility during the 2013-2014, 2012-2013, 2011-2012, and 2010-2011 wet seasons.

89.     Each day since August 3, 2009, that Defendant has failed to develop and

COMPLAINT

32

implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**FIFTH CAUSE OF ACTION**
**False Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

90.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

91.     Defendant has falsely certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least June 18, 2010.

92.     Each day since at least June 18, 2010, that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continue to be in violation of the General Permit's certification requirement each day that they maintain the false certification of their compliance with the General Permit.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as

COMPLAINT

alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the Permit;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.  Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.  Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

COMPLAINT

1    i.   Order Defendant to take appropriate actions to restore the quality of

2    waters impaired or adversely affected by their activities;

3
4    j.   Award Plaintiff's costs (including reasonable investigative, attorney,

5    witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

6    § 1365(d); and,

7
8    k.  Award any such other and further relief as this Court may deem

9    appropriate.

10

11   Dated: October 2, 2014          Respectfully submitted,

12                                    LOZEAU DRURY LLP

13

14                          By:    __/s/ Douglas J. Chermak_____

15                                 Douglas J. Chermak

16                                 Attorneys for Plaintiff
                                   CALIFORNIA COMMUNITIES AGAINST
17                                 TOXICS

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
                                      35